UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

FRIENDS OF MAGURREWOCK, INC.,    )
                                 )
                Plaintiff,       )
                                 )        CV-07-48-B-W
        v.                       )
                                 )
UNITED STATES ARMY CORPS OF      )
ENGINEERS, et al.                )
                                 )
                Defendants.      )

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

Friends of Magurrewock, Inc. (FOM) seeks to protect the Moosehorn National Wildlife Refuge (MNWR)[1] from the future development that they fear will be the inevitable result of the ongoing construction of a nearby third bridge from Canada into eastern Maine. The Court denies FOM's motion for preliminary injunction primarily because it concludes that the United States Army Corps of Engineers (Corps) was not acting arbitrarily and capriciously in its assessment of the practicality of alternatives, in its determination that the impact the bridge could have on MNWR is not reasonably foreseeable, and in its conclusion that an environmental impact statement (EIS) was not necessary. In any event, the Court concludes that the Corps has not

---

[1] According to the United States Fish and Wildlife Service's website, MNWR is one of 547 national wildlife refuges, and was established in 1937 by President Franklin D. Roosevelt, making it one of the oldest national wildlife refuges in the country. Covering 17,200 acres, MNWR's "primary purpose is to protect wildlife, including migrating waterfowl, wading birds, shorebirds, upland game birds, songbirds, and birds of prey." The statutory basis for the National Wildlife Refuge system is found in 16 U.S.C. § 668dd, which provides that the "mission of the [National Wildlife Refuge System] is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2). The Secretary of the Interior is charged with administering the system, entering into contracts, acquiring lands, and forming agreements with state fish and wildlife agencies. *Id.* The Secretary may also "permit the use of, or grant easements in, over, across, upon, through, or under any areas within the System for purposes such as but not necessarily limited to, powerlines, telephone lines, canals, ditches, pipelines, and roads, including the construction, operation, and maintenance thereof, whenever he determines that such uses are compatible with the purposes for which these areas are established." 16 U.S.C. § 668dd(d)(1)(B).

engaged in improper segmentation, since the construction of the bridge is independently justified.

## I.      PROCEDURAL HISTORY

On April 12, 2007, FOM filed suit against the Corps under the Administrative Procedures Act (APA), 5 U.S.C. § 706, Clean Water Act (CWA), 33 U.S.C. § 1344 *et seq.*, and the National Environmental Policy Act (NEPA) 42 U.S.C. § 4321 *et seq. See Compl.* (Docket # 1).  On May 2, 2007, FOM moved for a temporary restraining order and preliminary injunction.  *See Pl.'s Mot. for TRO* (Docket # 7); *Pl.'s Mot. for Prelim. Inj.* (Docket # 8) (*Pl.'s Mot.*).  On May 11, 2007, the Maine Department of Transportation (MDOT) filed an unopposed motion to intervene, pursuant to Federal Rule of Civil Procedure 24, which was granted by Magistrate Judge Kravchuk.  *See Mot. to Intervene* (Docket # 15); *Order* (Docket # 16).  Upon agreement of the parties, the Court dismissed FOM's motion for a TRO.  *See Order Dismissing Without Prejudice Mot. for TRO* (Docket # 25).  What remains is FOM's request for a preliminary injunction, seeking an order for the Corps to suspend and/or revoke its CWA Section 404 permit.

## II.     COMPLAINT ALLEGATIONS

FOM's Complaint contains two counts; each alleges that the Corps's decision to grant MDOT a CWA permit was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).[2]  Count I alleges NEPA violations, claiming the Corps limited its "evaluation under the NEPA to only a small portion of the proposed East-West Highway, yet expanding their benefits analysis to the entire highway . . . ."  *Compl.* ¶ 71.  In addition, FOM asserts the Corps "failed to reasonably acknowledge or factor into their analysis the secondary impacts of the potential widening of Route One on the Moosehorn National Wildlife Refuge, in violation of NEPA."  *Id.* ¶ 73.  FOM further claims the Corps failed "to

---

[2] This statutory provision is found in the Administrative Procedures Act (APA).

adequately identify and properly evaluate alternatives for the permitted project," *id*. ¶ 74, and "to adequately evaluate the direct, indirect and secondary harm to threatened endangered species and habitat," *id*. ¶ 75.  Finally, FOM avers that the Corps "permitted an irretrievable and irreversible commitment of resources prior to compliance with the NEPA," and "failed to acknowledge or factor into their analysis the significant public outcry and controversy" surrounding the proposed work, which would necessitate the preparation of an EIS.  *Id*. ¶ 77.

Count II claims the Corps violated the CWA by failing "to require the applicant to include and seriously consider less damaging alternatives . . . ."  *Id*. ¶ 81.  That is, according to FOM, the Corps's "decision not to adequately and independently assess the impacts of increased traffic through the MNWR and the possibility of necessary road widening of Route 1 negates its findings in the Environmental Assessment and Statement of Findings . . . and cannot form the basis for the lawful issuance of a permit under the CWA."  *Id*. ¶ 82.

FOM seeks declaratory and injunctive relief.  First, FOM requests a declaratory judgment that the Corps's actions were "arbitrary, capricious, unsupportable, contrary to law and in violation of the CWA" with respect to: (1) its environmental assessment; (2) its decision not to analyze the impact of potential widening of Route 1; and (3) its issuance of the CWA permit.  Alternatively, FOM seeks an Order requiring the Corps to prepare an EIS.  Next, FOM requests that the Court enjoin the Defendants "from taking any action on any new permit application for this PROJECT until they have prepared updated and reliable traffic studies and analyzed the probability of Route 1 widening through the MNWR pursuant to NEPA."  *Id*. ¶ 82.  Finally, FOM requests an award of reasonable attorney's fees.  *Id.*

## III.    STATEMENT OF FACTS

Within the vicinity of Calais, Maine, there are two ports of entry from Canada into the United States – one at Ferry Point and the other at Milltown.  According to the Federal Highway Administration (FHWA), Calais is the eighth busiest commercial border crossing along the Canadian border and MDOT's exploration of a third border crossing near Calais led to its application for federal funding in January 1999.  AR 6:255-56.  In January, 2001, the FHWA prepared a draft environmental assessment (EA) in which it evaluated three alternatives for the proposed project:  (1) the "no build" Alternative 1; (2) the Baileyville Bridge Alternative 2A; and, (3) the Calais Industrial Park Alternative 3, the MDOT's preference.  After analyzing the alternatives, FHWA issued a finding of no significant impact (FONSI) on July 31, 2002, choosing the Calais Industrial Park Alternative 3.  AR 5:290.

To proceed, the CWA mandated that the MDOT receive approval from the Corps, because the project would require work within the navigable waters of the United States, including the filling of wetlands.  Therefore, on March 2, 2006, MDOT applied for a fill permit pursuant to CWA Section 404.  After receiving comments from the public and other federal agencies, the Corps issued an EA on September 21, 2006.  It concluded that "based on the evaluation of environmental effects discussed in this document, the decision on this application is not a major federal action significantly affecting the quality of the human environment."  AR 6:155.  After receiving the Corps's approval, MDOT entered into contracts to build the bridge across the St. Croix River, perform wetlands mitigation, and construct the access road from the bridge to Route 1.  *See generally Aff. of Ernest Martin* (Docket # 20-2) (*Martin Aff.*).  In April 2007, the MDOT began construction of the new border crossing, provoking FOM to file this lawsuit on April 12, 2007, nearly seven months after the Corps approved the project.

## IV.   STANDARD OF REVIEW

### A.   Preliminary Injunction Standard

This Court analyzes a request for a preliminary injunction through application of the following four well-established factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and, (4) the effect (if any) of the court's ruling on the public interest.

*Esso Std. Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)); *see also Northwest Bypass Group v. United States Army Corps of Eng'rs*, 470 F. Supp. 2d 30, 36 (D.N.H. 2007).   The party seeking relief bears the burden of demonstrating that these factors "weigh in its favor."   *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003).   This burden is a heavy one: "Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."   *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003) (reversing the denial of a preliminary injunction in a CWA permitting case); *W. Ala. Quality of Life Coal. v. United States FHA*, 302 F. Supp. 2d 672, 679 (D. Tex. 2004) (a grant of the preliminary injunctive remedy "must be supported by specific findings of the court.").

### B.   Arbitrary and Capricious Standard

As a review of an action by a federal agency – the Corps – the standard of review is supplied by the Administrative Procedures Act (APA).   *See* 5 U.S.C. § 702.   Under the APA, a district court will uphold an agency's decision unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."   5 U.S.C. § 706(2)(A);[3] *see also*

---

[3] This statutory provision reads:

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97-98 (1983) ("The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.").  The First Circuit explained that the task of a court reviewing agency action under the APA's "arbitrary and capricious" standard is "to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Dubois v. United States Dep't of Agric.*, 102 F.3d 1273, 1284 (1st Cir. 1996); *see also Associated Fisheries of Maine v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) (explaining that an agency action is "arbitrary and capricious if the agency lacks a rational basis for adopting it — for example, if the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise."); *Penobscot Air Servs. v. FAA*, 164 F.3d 713, 719 (1st Cir. 1999) ("The task of a court reviewing agency action under the APA's 'arbitrary and capricious' standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for its action including a rational connection between the

---

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
    (B) contrary to constitutional right, power, privilege, or immunity;
    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
    (D) without observance of procedure required by law;
    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute; or,
    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
5 U.S.C. § 706.

facts found and the choice made.").

Conversely, an agency decision is not arbitrary or capricious if "the agency decision was based on a consideration of the relevant factors and there has not been 'a clear error of judgment' . . . ." *Dubois*, 102 F.3d at 1285 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).  "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result and respond to relevant and significant public comments.  However, neither requirement is particularly demanding." *Penobscot Air Servs.*, 164 F.3d at 719 n.3 (internal citations and quotation marks omitted).

The Court's review under this standard is "highly deferential," in that the agency action is presumed valid.  *Associated Fisheries*, 127 F.3d at 109.  In other words, this Court "is not empowered to substitute its judgment for that of the agency."  *Overton Park*, 401 U.S. at 416; *see also* 33 CHARLES ALAN WRIGHT & CHARLES H. KOCH, JR., FEDERAL PRACTICE & PROCEDURE § 8334 ("Arbitrary and capricious review communicates the least judicial role, short of unreviewability, in the word formula system.").  Notwithstanding the deferential standard, "it is not a rubber stamp." *Dubois*, 102 F.3d at 1285.  Rather, the Court "must undertake a 'thorough, probing, in-depth review' and a 'searching and careful' inquiry into the record." *Id.* (quoting *Overton Park*, 401 U.S. at 415-16).  In carrying out its review under the APA, the scope of the Court's assessment includes the whole administrative record.  *See* 5 U.S.C. § 706; *Overton Park,* 401 U.S. at 420 (district court review "is to be based on the full administrative record that was before the [agency head] at the time he made his decision"); *Cousins v. Sec'y  of United States Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989).

## V.      DISCUSSION

### A.      Likelihood of Success on the Merits

#### 1.      CWA

FOM's CWA arguments begin with a general contention that "the Corps did not complete its substantive environmental due diligence." *Pl.'s Mot*. at 11.  FOM refers to a May 16, 2006 letter from the EPA to the Corps, which outlined its environmental concerns and stated that the MDOT "must clearly address [the] remaining questions with respect to alternatives so that a fully informed determination of the LEDPA can be made by the Corps." *Id.*; AR 4:552. FOM asserts that MDOT never responded to the EPA's concerns, and made "contradictory statements about the need for, and the possibility of, widening Route 1 through the MNWR." *Pl.'s Mot*. at 12.  In light of FOM's allegations, the Court construes its essential CWA argument to be that the Corps did not consider the least environmentally damaging practicable alternative (LEDPA) when it selected Alternative 3 instead of Alternative 2A.

Under 40 C.F.R. § 230.10(a)(3), there is a  presumption that alternatives exist when the proposed project is not "water dependent."  The construction of the Calais border crossing does not "require access or proximity to . . . the special aquatic site in question to fulfill its basic purpose."  40 C.F.R. § 230.10(a)(3).  Thus, "when the basic purpose of a project may be accomplished without 'access or proximity' to a 'special aquatic site . . . practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise.'"  *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1262 n.12 (10th Cir. 2003) (quoting 40 C.F.R. § 230.10(a)(3)).  In other words, "under the CWA, it is not sufficient for the Corps to consider a range of alternatives to the proposed project:  the Corps must rebut the presumption that there are practicable alternatives with less adverse

environmental impact." *Id.*; *see also Nat'l Wildlife Fed'n, v. Whistler*, 27 F.3d 1341, 1344 (8th Cir. 1994) ("This presumption of practicable alternatives is very strong, creating an incentive for developers to avoid choosing wetlands when they could choose an alternative upland site . . . ." (citations and internal quotation marks omitted)).[4]   Hence, it is presumed that there existed alternatives to the chosen course of action, because the border crossing does not depend on an "aquatic site" for its existence.   The question becomes whether any existing alternatives were practicable, such that the discharge of fill into the wetlands could be avoided.

Here, the EA reflects that the Corps engaged in an analysis of potential alternatives.   The Corps concluded that the no-build alternative was not practicable.[5]   The Corps found that no-build "fails to meet the basic project purpose," because "there would be no improvement in overall system linkage, traffic congestion, inspection facilities, freight delay, homeland security, or public safety."   AR 6:144.   The EA states that the two current crossing points are "regularly overwhelmed forcing long queues that snake through downtown Calais, Maine and St. Stephen, New Brunswick.   The US Customs and Border Patrol facilities are inefficient and sub-standard and only compound the problem.   The existing problems would only be exacerbated as traffic volumes increase."   *Id.*   The EA acknowledged, however, that "[w]ith the no build alternative, there would be no impact to riverine or wetland resources."   *Id.*   The record does not contain a probative basis for concluding that the Corps's determination was arbitrary and capricious.

In addition to the no-build option, the Corps considered Alternative 2A, which would be

---

[4] In *Whistler*, the Corps approved conversion of approximately 14.5 acres of wetlands into deep water habitat, to allow a housing project boat access to the nearby Missouri River.   27 F.3d at 1343.   The National Wildlife Federation sought a preliminary injunction, alleging that the Corps conducted an improper alternatives analysis.   *Id.* at 1344.   The court noted the very deferential standard of review, even in light of the presumption of alternatives, and emphasized that "[c]entral to evaluating practicable alternatives is the determination of a project's purpose."   *Id.* at 1345.   Ultimately, the court found that the alternatives analysis was proper, explaining that because this project was water-dependent, the regulatory presumption did not exist.   *Id.*

[5] It is unclear whether FOM challenges the Corps's conclusion about the impracticality of the no-build option.   The FOM memorandum does not refer to the no-build option.

located in Baileyville, approximately eight miles southwest of Calais.  AR 6:144.  It would provide a "direct connection to Route 9, one of the primary east-west travel corridors from this region to Bangor, Maine and points south."  *Id.*  The Corps found this alternative both "available and practical;" *id.*, however, it did not consider Alternative 2A "less environmentally damaging." *Id.*  After reviewing "[a]vailable resource information and subsequent field verification by DOT staff," the Corps concluded that "up to 24.5 acres of wetland would be impacted by this alternative."  *Id.*  It also concluded that "[m]uch of these wetlands have higher functions and value than those associated with Alternative 3, the applicant's preferred alternative."[6]  *Id.*  By contrast, the Corps concluded that Alternative 3 (the chosen alternative) would "impact approximately 6.8 acres of wetland and stream corridor."[7]  AR 6:145.  Noting that Alternative 3 "utilizes a site that is already disturbed and fragmented by existing development and infrastructure and focuses development closer to the more populated Calais area . . . ," *id.*, the Corps also concluded that Alternative 2A "would have greater indirect impacts to unfragmented wildlife habitat and potentially higher impacts to Atlantic salmon."  AR 6:144.

FOM prefers Alternative 2A, which would not go through MNWR.  However, based on the administrative record, and constrained by its limited role in reviewing agency action, the Court concludes that FOM has not demonstrated a likelihood of success on the merits of their CWA claim that the Corps engaged in an improper analysis of alternatives in arriving at its

---

[6] At oral argument, FOM made plain its disagreement with the Corps's conclusion.  Instead, FOM says that, because Alternative 3 passes through the Moosehorn National Wildlife Refuge, that this is higher value wetland.  The Court's review of the agency's conclusion, however, is limited and the Corps reviewed "resource information and subsequent field verification by DOT staff."  AR 6:144.  This Court cannot conclude that the Corps's review based on the MDOT's staff verification was arbitrary and capricious.  Moreover, FOM's claim is linked to their argument that the widening of Route 1 is inevitable and, as the Court discusses, there is nothing in the record that would permit a judicial conclusion that the Corps's determination to the contrary was arbitrary and capricious.

[7] Even if Route 1 were widened – something MDOT has repeatedly stated is unnecessary – there is evidence in the record that the amount of wetlands affected by Alternative 3 would still be less than Alternative 2A.  *See* AR 3:250 ("If Route 1 were ever to be widened, we estimate the impact of widening would result in approximately 5 acres of direct impacts to Waters of the U.S.  Much of this impact would be within the right-of-way of Route 1.").

conclusion that Alternative 3 was the least environmentally damaging practicable alternative.

### 2. NEPA

The Supreme Court has written that NEPA "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). However, "it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Id*. at 350. "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action." *Id*. at 351. The role of the court reviewing the agency decision under NEPA is limited: "The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) (citations omitted); *see also Dubois*, 102 F.3d at 1284; 33 CHARLES ALAN WRIGHT & CHARLES H. KOCH, JR., FEDERAL PRACTICE & PROCEDURE § 8335 ("Without engaging in review of the actual resolution of factual questions of this variety, courts, by using the hard look standard, assure that the agency did a careful job at fact gathering and otherwise supporting its position.").

The primary manifestation of the goals of NEPA is the requirement that federal agencies consider the environmental impact of their actions; such consideration often takes the form of an EIS.[8] NEPA requires federal agencies to prepare an EIS for any major federal action "significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C). "An exception to this requirement applies when a less comprehensive environmental review, or

---

[8] An EIS is a detailed statement which evaluates "the environmental impact of the proposed action, [] any adverse environmental effects which cannot be avoided should the proposal be implemented, [] alternatives to the proposed action, [] the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and [] any irreversible commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C).

environmental assessment ("EA"), provides a basis for a finding of no significant impact ("FONSI")." *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987).

The passage of NEPA also resulted in the creation of the Council on Environmental Quality (CEQ), which has promulgated regulations outlining when an EIS – as opposed to an EA – is required. *See* 40 C.F.R. §§ 1501.3, 1501.4, 1508.9, 1508.13. The regulations define an EA as a "concise public document" that serves to "briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact [FONSI]." 40 C.F.R. § 1508.9(a);[9] *see also Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir. 1995); *Save Our Sonoran, Inc. v. Flowers*, CV-02-0761-PHX-SRB, 2006 U.S. Dist. LEXIS 26185, at *28 (D. Ariz. May 2, 2006). In addition, the Corps's regulations implementing NEPA clarify that an EIS is not always mandatory; in fact, "[m]ost permits will normally require only an EA." 33 C.F.R. § 230.7(a). Under the Corps's regulations, the stated purpose of an EA is for the Corps to evaluate "potential environmental effects of the proposed action and, if appropriate, its alternatives, for determining whether to prepare an EIS or a FONSI." 33 C.F.R. § 230.10.[10]

### a.   Widening of Route 1

FOM's primary argument under NEPA is that, with regard to the potential widening of Route 1, the Corps "failed to consider an important aspect of the problem." *Pl.'s Mot.* at 13

---

[9] This section also provides that the EA is to "[a]id an agency's compliance with [NEPA] when no environmental impact statement is necessary." 40 C.F.R. § 1508.9(a)(2). In this case, the Corps did not prepare an EIS. *See* AR 6:155 ("I find that based on the evaluation of environmental effects discussed in this document, the decision on this application is not a major federal action significantly affecting the quality of the human environment.").

[10] This regulation further instructs the Corps:

> While no special format is required, the EA should include a brief discussion of the need for the proposed action, or appropriate alternatives if there are unresolved conflicts concerning alternative uses of available resources, of the environmental impacts of the proposed action and alternatives and a list of the agencies, interested groups and the public consulted. The document is to be concise for meaningful review and decision.

33 C.F.R. § 230.10.

(quoting *Dubois*, 102 F.3d at 1285).   In addition, the Corps "failed to demand that MEDOT produce evidence that would answer questions posed by the EPA, as well as by opponents of the project."   *Id.*   According to FOM, such failures amount to NEPA violations that render the Corps's decision arbitrary and capricious.   *Id.*

Clarified at oral argument, FOM is essentially arguing that the Corps failed to consider the cumulative impact of the project, also referred to as "improper segmentation."   Under 40 C.F.R. § 1508.25, part of the CEQ regulations, a cumulative impact is:

> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.   The regulations require an agency to consider connected, cumulative, or similar actions in the same environmental impact statement.   *Id.*   The regulations define "[c]onnected actions" as those that are "closely related and therefore should be discussed in the same impact statement."   40 C.F.R. § 1508.25(a)(1).   According to the regulation, actions are connected if they: "(i) Automatically trigger other actions which may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; [or] (iii) Are interdependent parts of a larger action and depend on the larger action for their justification."   40 C.F.R. § 1508.25(a)(1)(i)-(iii).   "Cumulative actions" are those that, "when viewed with other proposed actions have cumulatively significant impacts."   40 C.F.R. § 1508.25(a)(2).   Finally, similar actions, "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together . . . in the same impact statement."   40 C.F.R. § 1508.25(a)(3).

Segmentation is improper when the segmented project "'has no independent justification, no life of its own, or is simply illogical when viewed in isolation.'"  *One Thousand Friends v. Mineta*, 364 F.3d 890, 894 (8th Cir. 2004) (quoting *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1139 (5th Cir. 1992)).[11]   The First Circuit has said that the agency "need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.  In this context, "reasonable foreseeability" means that "the impact is sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision."  *Dubois*, 102 F.3d at 1286 (citations and internal punctuation omitted).

FOM argues that the widening of Route 1 is a reasonably foreseeable cumulative impact. However, the record reflects that the Corps "considered potential impacts to the Magurrewock Stream and the marsh in making its LEDPA determination."  AR 6:152.  The EA acknowledged the concern of the opponents is "the potential future impact to Magurrewock Stream, [its] adjacent wetlands, and the associated Moosehorn National Wildlife Refuge should Route 1 have to be widened."  *Id.*  The EA reiterates:

> DOT and FHWA have repeatedly gone on record to state that out to and including the year 2030 design life of this project, there are no plans to widen or expand Route 1 at this location.  Similarly, DOT's two, six, or twenty year [statewide] transportation planning documents do not call for widening Route 1.

*Id.*  Further, the Corps noted that "[e]ven assuming that Route 1 has to be widened at some undetermined time beyond the year 2030 design life of the project, it is likely that avoidance and minimization measures can be utilized to minimize impacts to aquatic resources within the right-of-way."  *Id.*

---

[11] In *One Thousand Friends of Iowa*, the Eighth Circuit concluded that a highway interchange was not improperly segmented because it had independent utility.  364 F.3d at 894.

Under its narrow scope of review, the Court cannot conclude that the Corps's decision to credit the repeated representations of MDOT is arbitrary and capricious.[12]  To the extent FOM urges the Court to reach a contrary conclusion, it provides no convincing evidentiary basis for it to do so.  The Court concludes that FOM has not demonstrated a likelihood of success on this claim; rather, the evidence demonstrates that the Corps took a "hard look," as the law requires, and concluded that any widening of Route 1 is not sufficiently foreseeable to be considered a cumulative impact.

Further, to the extent FOM argues that the Corps failed to address the EPA's concerns about the widening Route 1, the record does not substantiate that the Corps's conclusions to the contrary were arbitrary and capricious.  Although the EPA expressed concerns about the traffic data, MDOT wrote a letter to the EPA, dated June 30, 2006, in which it addressed the EPA concerns about widening Route 1.  AR 3:248-50.  Again, it falls within the Corps's discretion to weigh the evidence and to arrive at conclusions based on the administrative record.  The Court cannot say that in deciding to accept MDOT's representations that it contemplates no such widening, the Corps acted arbitrarily and capriciously.[13]

---

[12] FOM makes much of a statement made by John G. Melrose, then MDOT Commissioner, in a May 28, 2002 letter to Percy Mockler, then Transportation Minister for the Province of New Brunswick.  *See Compl.* Ex. B (Docket # 1-3).  Commissioner Melrose wrote:

> The MaineDOT owns 100 feet (approximately 33 meters) of right-of-way through the Moosehorn National Wildlife Refuge.  Based upon our conversations and meetings with the Federal and State environmental regulatory agencies, widening Route 1 to four lanes through this section can be accomplished, if necessary in the long term. . . . [The Corps has] stated that as long as the MaineDOT stays within its 100-foot wide right-of-way, it would receive a permit allowing lane capacity.  They further stated that the MaineDOT has never been denied a permit to make improvements to an existing transportation facility within its existing right-of-way.

*Id.*  Former Commissioner Melrose's written comments to the New Brunswick Department of Transportation do not effectively contradict its current position as conveyed to the EPA.  MDOT has repeatedly represented that it has no plans to widen Route 1 in the short term or long term, but is capable of doing so, if necessary.

[13] The Corps did not take MDOT's representation at face value.  It noted that "both DOT and FHWA have repeatedly gone on record to state that out to and including the year 2030 design life of the project, there are no

Moreover, the border crossing has an independent justification under *One Thousand Friends*, because even without the widening of Route 1, the border crossing satisfies the basic project purpose "to provide a border crossing facility that will safely and efficiently allow the movement of traffic, goods and services in the Calais, Maine and St. Stephen, NB area."  AR 6:142.  The Corps concluded that the new border crossing would stand alone as an improvement to the *status quo* by diverting traffic from downtown Calais, providing more space to conduct customs inspections, and lubricating the flow of commerce between Canada and the United States.  Whether FOM's fear – the widening of Route 1 through MNWR as part of the unrealized vision of an "East-West Highway" – comes true, FOM has not demonstrated a likelihood of success on its claim that the Corps's decision was arbitrary and capricious, and contrary to the requirements of NEPA.

### b.    "Controversy" requires an EIS

FOM contends that the Corps should have prepared an EIS due to the controversial nature of the proposed project.  According to FOM:

> [T]he Corps failed to acknowledge or factor into their analysis the significant public outcry and controversy surrounding the potential impacts of the PROJECT on the MNWR and the substantial questions and uncertainty regarding future traffic through the Refuge and the possibility of future widening of Route 1 – which controversy triggers the need for an EIS – in violation of NEPA.

*Pl.'s Mot*. at 13.

Under NEPA, an agency must prepare an EIS for any major federal action "significantly affecting the quality of the human environment . . . ."  42 U.S.C. § 4332(2)(C).  The CEQ regulations further define the term "significantly" in terms of "context" and "intensity."  40

---

plans to widen or expand Route 1 at this location."  AR 6:152.  It confirmed that the MDOT two, six, and twenty year plans do not call for widening Route 1 at that location.  *Id.*  Finally, it addressed the possible impact of what the impact would be, if the "Route 1 has to be widened at some undetermined time beyond the year 2030. . . ."  *Id.*

C.F.R. § 1508.27.  To evaluate "intensity," the regulation lists as one consideration "the degree to which the effects on the quality of the human environment are likely to be highly controversial."  40 C.F.R. § 1508.27(b)(4).  Courts have not construed this factor in the broad sense of the word "controversial."  In *Greenpeace Action v. Franklin*, 14 F.3d 1324 (9th Cir. 1992), the Ninth Circuit said:

> An agency's careful evaluation of the impact of its proposed action, its collection and review of evidence, and its reasoned conclusions as to what the date reveals would be for naught if by simply filing suit and supplying an affidavit by a hired expert, predicated upon the same facts relied upon by the agency but reaching a different conclusion, a litigant could create a controversy necessitating an EIS.

*Id.* at 1335.  Moreover, as the Fourth Circuit has pointed out, the term "controversial" is not synonymous with "opposition."  *See North Carolina v. Fed. Aviation Admin.*, 957 F.2d 1125, 1134 (4th Cir. 1992) (adding that "[o]therwise, opposition, and not the reasoned analysis set forth in an environmental assessment, would determine whether an environmental impact statement would have to be prepared. . . .  The outcome would be governed by a 'heckler's veto.'").  The Ninth Circuit's framing of the controversy in *Babbitt* is telling:  "[National Parks & Conservation Association] asserted that the effects on the environment would likely be substantial.  The [National] Parks Service responded that the extent of the effects was unknown.  Therein lay the controversy."  241 F.3d at 737.  The court did not excuse the Parks Service from preparing an EIS to find out the extent of the effects "when there is a reasonable possibility that such information can be obtained in connection with the preparatory process."  *Id.*

Here, FOM's contention fails for two reasons.  First, the type of controversy described by FOM is akin to the "heckler's veto" described by the Fourth Circuit, and not a *bona fide* controversy as to the environmental effects of the project.  If this were the standard, then an EIS

would always be necessary if an opposition group voiced opposition to a proposed project requiring Corps approval.  Second, the EA reflects that the Corps did, in fact, consider FOM's opposition to the project.  *See, e.g.,* AR 6:149 ("A principal voice for those opposed to the Calais Alternative is the Friends of Magurrewock, a local conservation organization."); AR 6:153 ("The Corps also arranged an opportunity for the Friends of Magurrewock to meet with DOT, FHWA, the USFWS, and the US EPA on December 2, 2005 to voice their concerns and to better understand the Federal process."); AR 6:470 (document titled "Friends of Magurrewock Statement for Dec. 2, 2005 meeting with MDOT, USACE and others").  In sum, FOM has not met its burden to show a likelihood of success on this NEPA claim either.[14]

### B.    Irreparable Harm

FOM's argument with respect to this factor echoes the First Circuit's holding in *Massachusetts v. Watt*: "[W]hen a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered."  716 F.2d 946, 952 (1st Cir. 1983). FOM correctly notes that, on this point, then Circuit Judge Breyer wrote:

> [T]he harm at stake in a NEPA violation *is* a harm to the *environment*, not merely to a legalistic 'procedure,' nor, for that matter, merely to psychological well-being. . . .  The way that harm arises may well have to do with the psychology of decisionmakers, and perhaps a more deeply rooted human psychological instinct not to tear down projects once they are built.  But the risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation. The difficulty of stopping a bureaucratic steam roller, once started, still seems to us . . . a perfectly proper factor for a district court to take into account in assessing that risk, on a motion for a preliminary injunction.

*Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st. Cir. 1989) (emphasis in original); *see also Puerto*

---

[14] Having found that FOM did not meet its burden as to the first factor of the preliminary injunction analysis, the Court could end its inquiry here.  But, in excess of caution, it will evaluate the remaining three factors.

*Rico Conserv. Found. v. Larson*, 797 F. Supp. 1066, 1072 (D.P.R. 1992) ("Thus, a violation of NEPA can itself be considered irreparable injury.").[15]   This argument, however, depends on a finding that FOM has met its burden to show that it is likely to succeed on its NEPA claims. But, here, the Court has concluded that FOM has failed to make out a NEPA violation. Accordingly, the Court concludes that FOM has not met its burden on this factor of the analysis.[16]

## C.      Balance of Hardships[17]

The First Circuit has termed the third factor the "balance of relevant impositions," assessing "the hardship to the nonmovant if enjoined as contrasted to the hardship to the movant if no injunction is granted." *Esso*, 445 F.3d at 18. The most compelling argument under this factor is MDOT's point that a preliminary injunction at this late date would have significant financial consequences – a burden that would be borne, ultimately, by the taxpayers of the state of Maine. Following Corps approval for the project, but prior to the filing of this lawsuit, MDOT entered into contracts for the work to be done on the new border crossing. In October 2006, MDOT awarded Cianbro Corp. the contract to build the new bridge from St. Stephen to Calais. *Martin Aff.* ¶ 7. Under the contract, which amounts $11,580,354.00, the work is to be completed by September 1, 2008. *Id.* MDOT has the right to suspend or terminate this contract, but would have to pay for all accepted material and work, and the contractor is entitled to file a claim for additional damages or costs. *Id.* ¶¶ 5, 8. In addition, MDOT hired Fundy Contractors

---

[15] In *Puerto Rico Conserv. Found.*, the district court held: "We have enough evidence before us to find that defendants' attempts to proceed with the El Yunque project may constitute a NEPA violation." *Id.* at 1072. Thus, the court concluded that the plaintiff met its burden to show irreparable harm.

[16] Even if the Court had concluded otherwise, this would not necessarily require a preliminary injunction. *See Conserv. Law Found. v. Busey*, 79 F.3d 1250, 1272 (1st Cir. 1996) ("[O]ur holdings did not mean 'that a likely NEPA violation automatically calls for an injunction; the balance of harms may point the other way.'") (quoting *Marsh*, 872 F.2d at 504).

[17] FOM's argument under this section, *see Pl.'s Mot.* at 15-16, focuses more on the final public interest factor, which is discussed below.

"to build the new roads and perform the project wetland mitigation in the Calais, Maine area." *Id.* ¶ 3. Under the agreement, which amounts more than $9,000,000, MDOT can suspend or terminate the contract, but MDOT will have to pay for all accepted material and work, and Fundy can submit a claim for damages, which MDOT estimates could be in excess of $2,000,000. *Id.* ¶¶ 3, 5, 6. Both Cianbro and Fundy Contractors have commenced work on their respective aspects of the project. *Id.* ¶¶ 4, 7.

With regards to its hardship, the Corps argues: "An injunction will harm the Corps because tardy challenges and requests for injunctive relief, mounted months after a permit is issued and after construction begins, undermine the integrity of the Corps' permitting program." The Corps cites *Allens Creek/Corbetts Glen Preservation Group, Inc. v. Caldera*, 88 F. Supp. 2d 77 (W.D.N.Y. 2000), which also involved a preliminary injunction, and a motion for summary judgment by the Corps on the basis of laches. In that case, the district court addressed the prejudice to the Corps from the delay between the approval process and the lawsuit filed by the plaintiff. The court stated: "The integrity of the permit process and the value of Corps review and approval is substantially undermined if challenges may be mounted indefinitely, as plaintiffs seek to do here." *Id.* at 85. In that case, there was an eight-month delay between the issuance of the wetlands fill permit and the date the complaint was filed. By that time, the wetlands had already been filled.

Here, while the Corps has not yet moved for summary judgment on the basis of laches, *Allens Creek* is still informative. As in *Allens Creek*, the Court finds troubling the six-month delay between the Corps's approval in September 2006 and the filing of the Complaint in April 2007. During that period, MDOT entered into two contracts with construction companies, who began work on the project in April, and continue their work on the project.

At oral argument, FOM presented no excuse for the delay, except its counsel represented that she was not retained until about a month before the Complaint was filed.  That FOM's counsel herself was diligent once retained does not justify FOM's failure to promptly retain her and the record is silent as to why it did not act earlier.  If FOM had promptly challenged the Corps's decision, instead of waiting to file suit until after MDOT entered into the construction contracts and the subsequent start of work on the project, it could have mitigated the impact on MDOT and its contractors.  But the record does not allow the Court to find any valid excuse for delay.  The Court concludes that the hardship to the Corps and MDOT outweighs any hardship to FOM.

### D.      Public Interest

The final factor is the public interest.  This factor requires the Court to "inquire whether there are public interests beyond the private interests of the litigants that would be affected by the issuance or denial of injunctive relief."  *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 193 (D. Me. 2005).

FOM argues that granting preliminary injunctive relief serves the public interest, because the construction project, "if allowed to continue unabated, will soon reach the point where it will in fact be very expensive to remove any concrete and other construction that is in place."  *Pl.'s Mot*. at 15.  In addition, FOM contends that this project will result in the "inevitable widening of Route 1 through an area that is protected open space, recognized for its ecological, recreational, educational and aesthetic significance."  *Id*.

On the other hand, the Corps and MDOT focus on the attendant benefits of a completed project.  The Corps argues that the public interest is served by the construction of the Calais crossing without delay, listing the numerous disadvantages of postponed construction: (1) freight

delays of up to 1½ hours; (2) weakened border security due to the inability of U.S. Customs and Border Patrol to perform their functions in the substandard Ferry Point and Milltown crossings; and, (3) adverse impact on the "bidding climate" if an injunction delays construction, leading to increased costs of construction.  *Federal Defs.' Mem. in Opp'n to Mot. for TRO and Prelim. Inj.* at 19-20 (Docket # 18).  MDOT adds that the new border crossing will result in decreased traffic congestion and safer, more efficient roads.  *MDOT's Mem. of Law in Opp'n to Pl.'s Mot. for TRO and Prelim. Inj.* at 14-15 (Docket # 20).

FOM's argument here relies on the same speculation that this project will result in "inevitable widening" of Route 1, and the Court concludes that the public benefits in continuing construction of the crossing outweigh any speculative public benefits from enjoining its continued construction.

## VI.    CONCLUSION

The Court DENIES Plaintiff's Motion for Preliminary Injunction (Docket # 8).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 11th day of July, 2007